JARRETT et al. v. HALSEY et al.

(Circuit Court of Appeals, Fourth Circuit.   July 27, 1917.)

No. 1526.

1. PUBLIC LANDS ⬅186—WEST VIRGINIA—FORFEITURE.
Under Act Va. March 22, 1842 (Acts 1842, c. 13), declaring that all the right, title, and interest which shall be vested in the commonwealth in any lands west of the Allegheny Mountains by reason of nonpayment of taxes, or the failure of the owners to cause the same to be entered, shall be absolutely transferred to and vested in any person or persons other than those for whose default the same may have been forfeited, for so much as such persons may have just title or claim to or derived from under any grant bearing date previous to January, 1843, who shall have discharged all taxes duly assessed and charged against him or them under such lands, and all taxes that ought to have been assessed or charged thereon, one claiming that a senior grant of such lands was on forfeiture, vested in him because of payment of taxes has the burden of showing strict compliance with the act, and hence defendants, who claimed under a grant subsequent to that of plaintiffs' predecessor which had been forfeited for nonpayment of taxes and resold, cannot defeat plaintiffs' title where they failed to show a listing of the land for taxation and payment of taxes by their predecessors for several years after the execution of the grant under which defendants claimed; the purpose of the act being to protect bona fide holders and claimants who had paid taxes against the rights of rival claimants who obtained grants at a nominal cost, but failed to pay the taxes.

2. PUBLIC LANDS ⬅186—FORFEITURE TO STATE—TRANSFER OF TITLE.
Where on behalf of defendants who claimed land in West Virginia only an undivided interest in the entire tract was listed or assessed, the failure to have assessed and pay the taxes on the remainder operated under Const. West Va. art. 13, § 3, as a forfeiture of the entire tract, and title passed to a rival claimant as by adverse possession who had paid taxes thereon for five years.

3. ABATEMENT AND REVIVAL ⬅12—GROUNDS OF ABATEMENT.
The pendency of a suit in a state court is no ground for plea in abatement to a suit on the same matter in a federal court.

4. ABATEMENT AND REVIVAL ⬅5—GROUNDS OF ABATEMENT.
Causes at law and in equity are so dissimilar that the pendency of one cannot be pleaded in abatement of the other.

In Error to the District Court of the United States for the Southern District of West Virginia, at Charleston; Benjamin F. Keller, Judge.

Action by R. Ogden Halsey and others against Irvin Jarrett and others.   There was a judgment for plaintiffs, and defendants bring error.   Affirmed.

This is an action of ejectment instituted in the District Court of the United States for the Southern District of West Virginia by plaintiffs, R. O. Halsey,

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

and others, against Irvin Jarrett and others, defendants, to recover a parcel of land situate in Fayette county, W. Va.

The plaintiffs base their title on a survey made by James Welch of 4,500 acres of land which was situated in the county of Greenbrier in 1802, and a grant followed in 1805. In 1818 this land became situate in the county of Nicholas, and afterwards, about 1831, most of it became situated in the county of Fayette. Under acts of the Legislature of Virginia forfeiting lands for the nonpayment of taxes. this parcel became forfeited and was sold in the summer of 1843 by the commissioner of delinquent and forfeited lands for the county of Fayette, and the plaintiffs claim title under this sale by deed from Alfred Beckley, commissioner of delinquent and forfeited lands of Fayette county, which deed is dated on the 16th day of June, 1843.

The title of Irvin Jarrett and others is based upon a survey made on the 14th day of August, 1799, for 600 acres for Henry Banks. This was followed by a grant in the year 1822 from the Governor of Virginia for this six hundred acres. The reason for the holding up of the grant so long was the fact that there was a suit pending between Henry Banks, as plaintiff, and Duvall and others, as defendants, in a court in Richmond, Va., involving the ownership of the land when the grant thereof was made. In 1824, as shown by the deed this 600-acre tract of land was sold in this suit by a special commissioner therein appointed, and became the property of Aaron Stockton and Joel Shrewsbury.

It is claimed by the plaintiffs in the ejectment suit that, although their survey was late, their grant was first, and, there being no exceptions in their grant, all the title of the commonwealth was vested in James Welch under the grant of 1805.

To meet this, the defendants in the ejectment suit claim that the lands so bought by Stockton and Shrewsbury were duly assessed with and the taxes paid thereon up to and including the year 1842.

By an act of the Legislature of Virginia passed on the 22d day of March, 1842 (Acts 1842, c. 13) it was provided in the third section that any forfeited titles then in the state of Virginia should be vested in any person having just title and claim thereto under any grant of the commonwealth bearing date prior to the 1st day of January, 1843, who shall have discharged all taxes duly assessed and charged against him upon such land. The section in question is in the following language: "And be it further enacted, that all the right, title and interest which shall be vested in the commonwealth in any lands or lots lying west of the Alleghany Mountains, by reason of the nonpayment of the taxes heretofore due thereon, or which may become due on or before the first day of January next, or of the failure of the owner or owners thereof to cause the same to be entered on the books of the commissioners of the proper counties, and have the same charged with taxes according to law, by virtue of the provisions of the several acts of assembly heretofore enacted, in reference to delinquent and omitted lands, shall be and the same are hereby absolutely transferred to and vested in, any person or persons (other than those for whose default the same may have been forfeited, their heirs or devisees), for so much as such person or persons may have just title or claim to, legal or equitable, claimed. held or derived from or under any grant of the commonwealth, bearing date previous to the first day of January eighteen hundred and forty-three, who shall have discharged all taxes, duly assessed and charged against him or them upon such lands, and all taxes that ought to have been assessed or charged thereon, from the time he, she or they acquired title thereto, whether legal or equitable: Provided. that nothing in this section contained, shall be construed to impair the right or title of any person or persons, who shall bona fide claim said land by title, legal or equitable, derived from the commonwealth, on which the taxes have been fully paid up according to law, but in all such cases the parties shall be left to the strength of their titles respectively."

It was shown that the lines on the trial map show the location of the Banks survey and grant of 600 acres under which Jarrett and others claim, and also the lines of the land in controversy. Under the agreed statement of facts it appears that about 172 acres of the Banks grant interlocked with the Welch grant. The greater part of the Banks grant lay in the county of Nicholas,

leaving about 172 acres thereof in what is now the county of Fayette, but which was prior to its formation in the county of Nicholas.

George W. McClintic, of Charleston, W. Va. (McClintic, Mathews & Campbell, of Charleston, W. Va., and W. C. Reddy of Summersville, W. Va., on the brief), for plaintiffs in error.

E. C. Harrison and Buckner Clay, both of Charleston, W. Va. (Browning & Browning, of Orange, Va., on the brief), for defendants in error.

Before PRITCHARD, KNAPP, and WOODS, Circuit Judges.

PRITCHARD, Circuit Judge (after stating the facts as above). In this action of ejectment the court below directed a verdict and judgment for plaintiffs, and the defendants have sued out this writ of error. The parties will be designated as they stood below. This controversy involves an overlap of 172 acres of land.

The plaintiffs, Halsey and others, claim under a Virginia grant of 1805 to one Welch of 4,500 acres which became forfeited and was in 1842 divided into lots and sold under the Virginia act of 1837, as amended in 1838. The defendants claim under a grant of the state of Virginia in 1822 to Banks for 600 acres.

By stipulation the substantial facts have been agreed and the issues have been narrowed by counsel to the determination of two questions:

First. Was the forfeited Welch title by operation of the legislative act of Virginia of March 22, 1842, transferred to and vested in the alienees of the Banks title so that the latter in law became the senior title?

Second. If so, did the Banks title subsequently become forfeited to the state by reason of nonpayment of taxes and under section 3, art. 13, of the Constitution of West Virginia, in turn become vested in plaintiffs as alienees of the purchasers of the Welch title under the sale of that title by the school commissioners under the act of 1842?

It is difficult to determine these questions intelligently without, to a limited extent, outlining the policy of the state of Virginia relative to lands lying west of the Alleghenies now largely embraced in the state of West Virginia.

From such cases as Fay v. Crozer (C. C.) 156 Fed. 486, Atkins v. Lewis, 14 Grat. (Va.) 30, and text-books such as Hutchinson's Land Titles (West Virginia), we find that Virginia in 1779 established, by legislative act, a land office and authorized the sale of lands west of the Alleghenies for two cents an acre to any one who, at his own expense, would cause a survey to be made, warrant and entry to be filed and patent secured for the number of acres selected and applied for. Doubtless the purpose of this legislation was twofold: First, to secure revenue by way of fixed and settled taxation; and, second, to secure pioneers to go and settle in these unbroken forests in the mountains. The legislation was, however, so loosely drawn and so limited in scope that it in practical effect thwarted both of its purposes and led to great confusion and litigation touching titles. Speculators made surveys of large tracts, possibly by making one or two corners and laying off the remaining lines on paper by protraction and naming other corners by

guess; others in a like way laid off, entered, and secured patents for similar large tracts, regardless of whether they covered or overlapped former surveys until it was not unusual for the same land to be the subject of several different grants. The owners of these grants lost confidence in their integrity and failed to pay taxes assessed, and persons seeking to settle found themselves wholly unable to determine from whom to buy a sound title. The result was that many acts were passed with a view to correct the evils thus created. Forfeitures for failure to pay taxes were declared, and then these forfeitures were repealed by other acts allowing redemption to be made within specific times. Finally, in 1837 and 1838, acts were passed prohibiting redemption of all delinquent and forfeited lands from and after July 1, 1838, and providing for their sale for the benefit of the school fund by a commissioner of delinquent and forfeited lands appointed in each county, under decree of the circuit courts of law and chancery.

By these acts these forfeited titles, good and bad, for what they were worth, became reinvested in the commonwealth. By their sale provisions it was proposed to start over again, and by means of the court's decree of confirmation and authorization the deed of the commissioner practically became a new grant from the commonwealth for the land sold.

But almost from the beginning of these forfeiture acts and those relieving such forfeitures and extending the times in which to redeem, it was apparent that actual settlers had purchased from junior grantees and were in actual possession and paying taxes to the state. To protect those, provisions were made allowing such settlers in actual possession and paying taxes to hold their lands as against senior forfeited titles.

In March, 1842, an act was passed that such forfeited senior title should be transferred to the holder of a junior grant, provided such junior grantee had paid all taxes charged and chargeable against him, thus making the junior grantee in effect, to the extent of any overlap, the senior upon the sole condition that he had upon his part paid all taxes charged or chargeable upon the lands embraced in his junior grant, and not upon the further condition, as theretofore, of his also being in actual possession.

The Welch title, overlapping by these 172 acres in controversy the Banks patent, was forfeited and sold in June, 1842, 14 days after this last-named act went into effect, by the commissioner of delinquent and forfeited lands, and the defendants now claim that by the provisions of this act their junior grant of 1822, embracing this 172 acres, became the senior one and gives them the right to the land. Whether or not it does depends upon whether from 1822 to 1842 their alienors had paid all taxes "charged or chargeable" upon the 600 acres embraced in the Banks grant.

[1, 2] It seems clear to us that, in order to defeat the commonwealth's right to retake and sell the land embraced in the senior forfeited grant and to regrant the same to a new purchaser in good faith, the obligation is upon those holding under the junior grant to show strict compliance with the requirements of this act of 1842, before they can claim that the senior grant has been transferred and vested

in them. This they have failed to do. The evidence shows that, although this junior grant was dated July 2, 1822, no assessment of taxes, nor payment of taxes chargeable thereon, were made on the 600 acres until 1825. Such taxes were, under the tax laws of Virginia then existing, clearly due and payable for the years 1823 and 1824, and there can be no question from the evidence that such taxes were not paid. It would seem from the evidence further that the taxes on the land were not paid for the years 1832 and 1833. Certain it is that taxes were assessed for those years and the land returned delinquent for nonpayment, and no redemption is shown. However, it may be assumed from the fact that no sale for delinquency was made, and the grantees of the land have since continued payment, that such question as to those two years would have been one of fact for the jury, and therefore we put aside all further consideration of that matter. The failure to pay all taxes for each and every year by the junior grantee was imperative to give him the benefit of the act of 1842. He failed to pay for the two years of 1822 and 1823, and therefore the right to plead the benefit of this act never has accrued to him or his alienees, and the Welch title, sold and regranted by the commonwealth by and through Beckley, the commissioner of delinquent and forfeited lands, to the alienors of plaintiffs, must be held to be the senior and superior title. It also appears that the plaintiffs' predecessors on title obtained a deed from Beckley, commissioner of forfeited and delinquent lands, in 1843, and taxes have since been paid under this title. For five years after 1875, on behalf of the defendants, only an undivided half interest in the entire tract claimed was assessed as 178 acres. The failure to have assessed and to pay the taxes on the remainder of this undivided interest produced a forfeiture of all, and this forfeiture inured to the benefit of the plaintiffs paying the taxes on all and holding a conveyance from the state through Beckley, commissioner. Smith, trustee, v. Tharp, 17 W. Va. 221; Toothman v. Courtney, 62 W. Va. 167, 58 S. E. 915, 921; Rowland Land Co. v. Barrett, 70 W. Va. 704, 75 S. E. 57; Lawson v. Pocahontas, etc., Co., 73 W. Va. 296, 81 S. E. 583; Caretta Ry. Co. v. Fisher, 74 W. Va. 115, 81 S. E. 710; Ewart v. Squire, 239 Fed. 34, —— C. C. A. ——, decided by this court December 2, 1916.

[3, 4] As regards the action of the court below, sustaining the demurrer to the plea in abatement the assignment of error in relation thereto does not seem to be insisted upon by counsel for defendants, and rightly so. The cases of Gordon v. Gilfoil, 99 U. S. 168, 178, 25 L. Ed. 383, and Risher v. Wheeling Roofing & Cornice Co., 57 W. Va. 149, 156, 49 S. E. 1016, 1019, very clearly established the two propositions:

(a) "That the pendency of a suit in a state court is no ground * * * for a plea in abatement to a suit upon the same matter in a federal court;" and (b) "that two causes, one at law and one in equity, are ex necessitate so dissimilar that the pendency of one cannot be pleaded in abatement of the other."

We see no error in the action of the court below in directing the verdict for the plaintiffs, and its judgment in this case must be affirmed.